[No. F024911. Fifth Dist. July 31, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME JAVIER AGUIRRE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and II.

COUNSEL

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, John A. O'Sullivan and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STONE (W. A.), Acting P. J.—

## BACKGROUND

In the late afternoon of April 14, 1995, appellant Jaime Javier Aguirre shot and killed Francisco Duran in the parking lot of the Corner Pocket, a Bakersfield pool hall. Witnesses testified Duran was leaving the pool hall with some friends when Aguirre pulled into the parking lot and quickly got out of his truck. He walked up to Duran and fired seven shots at close range into Duran's head and upper torso.

Undisputed testimony at trial outlined the circumstances precipitating the incident. Aguirre and his girlfriend, Florita, had been living together for years with their two children.[1] Since December 1994, however, Florita had been having an affair with Duran. Aguirre became aware of the affair when his elder child told him she saw Florita and Duran kissing. Although their relationship remained fairly stable, Aguirre felt upset and hurt by Florita's affair and often told her to end it. He was particularly upset to learn Duran sometimes visited Florita at the Corner Pocket where she worked as a manager.

A mutual hostility developed between Duran and Aguirre, which often involved other family members and friends. Aguirre frequently received warnings from Duran's family to leave Duran alone because they would avenge any violence toward him, no matter how deserved it may be. Aguirre later testified he felt threatened and purchased a gun in March 1995 to protect himself. He kept the gun in a lockbox in the back of his truck.

---

[1] Aguirre refers to Florita as his "common law" wife. However, absent circumstances not relevant here, California does not recognize a common law marriage. (Fam. Code, § 300; *Tatum* v. *Tatum* (9th Cir. 1957) 241 F.2d 401.)

On April 14 Aguirre's employer let Aguirre leave work early because he and a fellow employee had been arguing. Aguirre arrived home at approximately 2:30 p.m. to shower and change clothes. His niece, Adreanna, was babysitting the children while Florita was at work. He told Adreanna not to call Florita to tell her he was on his way to see her. The investigating officer later testified Adreanna told him Aguirre did not want Florita to warn Duran to leave. Nevertheless, when Florita called, Adreanna told her Aguirre would be there.

Duran arrived at the Corner Pocket with some friends around 3:30 p.m. He spoke to Florita and then told his friends they should leave because Aguirre was on his way and would be very upset to see him. As they were walking to their cars, Aguirre arrived in his truck. He took the gun, which he had moved from the lockbox to the front cab earlier that day, walked up to Duran and shot him at close range multiple times. He then put the gun in his pocket, looked at Duran's body, got back in his truck and drove away.

Aguirre went to the home of Florita's sister, Denise. He yelled to her, "I killed him. I killed him," and then left, declaring he was going to kill himself. At approximately 8:05 that evening, Aguirre turned himself in to the police, admitting he had committed murder. The police uncovered a handgun in his pocket.

A jury convicted Aguirre of murder in the second degree (Pen. Code,[2] §§ 187, 189) and found a personal use of a firearm enhancement to be true. (§ 12022.5, subd. (a).) The court sentenced Aguirre to a term of 15 years to life in prison plus a mitigated 3-year term for the enhancement.

DISCUSSION

I., II.\*

. . . . . . . . . . . . . . . . . . . . . . . .

III. *Presentence Credits*

 Aguirre's final argument focuses upon the calculation of presentence credits awarded to him at sentencing. The probation report tallied his credits at 193 days—168 days of actual time and 25 goodtime/worktime days. The total was calculated pursuant to section 2933.1, subdivision (c) which limits presentence conduct credits to 15 percent of actual time served

---

[2]All further statutory references are to the Penal Code unless otherwise noted.

\*See footnote, *ante*, page 1135.

for those persons convicted of offenses listed in section 667.5 (15 percent of 168 days).

Aguirre contends his presentence credits should not be subjected to the 15 percent limitation. ▉ He made no objection at trial. Nonetheless, he asserts he may appeal the issue because waiver of sentencing only occurs when the alleged error involved an exercise of discretion. We agree. Because the calculation of credits is purely mathematical, and because Aguirre's argument involves a statutory interpretation of first impression, we hold his failure to object at trial does not waive the issue on appeal. (*People* v. *Scott* (1994) 9 Cal.4th 331, 353 [36 Cal.Rptr.2d 627, 885 P.2d 1040] [". . . the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices."]; see also *People* v. *Eastman* (1993) 13 Cal.App.4th 668, 679 [16 Cal.Rptr.2d 608].) The calculation of credits is not discretionary and there are no "choices."

▉ Turning to the merits, we first address Aguirre's argument the 15 percent limitation was improperly applied to his goodtime conduct credits. We begin by setting out the relevant portions of the statutes at issue:

Section 2933.1:

"(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933.

". . . . . . . . . . . . . . . . . . . . . . .

"(c) Notwithstanding Section 4019 or any other provision of law, *the maximum credit* that may be earned against a period of confinement in, or commitment to, a county jail, . . . following arrest and prior to placement in the custody of the Director of Corrections, *shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)*." (Italics added.)

Section 2933 defines worktime credit as follows: "(a) It is the intent of the Legislature that persons convicted of a crime and sentenced to the state prison under Section 1170 serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Director of Corrections for performance of work, training or education programs established by the Director of Corrections. Worktime credits shall apply for performance in work assignments and performance in elementary, high school, or vocational education programs. . . . For every six months of

full-time performance in a credit qualifying program, as designated by the director, a person shall be awarded worktime credit reductions from his or her term of confinement of six months. A lesser amount of credit based on this ratio shall be awarded for any lesser period of continuous performance. . . ."

Aguirre's position is this: His presentence credits were limited to 15 percent of the actual time served pursuant to section 2933.1, subdivision (c). This provision specifically refers to subdivision (a) of the same section. Subdivision (a), however, applies the 15 percent limitation to *worktime credits* only. Worktime credits are defined in section 2933 and, as Aguirre points out, do not include the goodtime credits he accrued while in county jail. Therefore, the 15 percent limitation does not apply to him and he is entitled to 252 days of credit under the standard calculation formula. (168 actual days divided by 4, multipled by 2, and added to 168 equals 252.) (§ 4019; *People* v. *Smith* (1989) 211 Cal.App.3d 523 [259 Cal.Rptr. 515].)

We reach a different conclusion. In our view, the reference in subdivision (c) to subdivision (a) serves only to clarify the intended target population. The provisions of section 2933.1, subdivision (c) make clear it applies only to persons previously defined in subdivision (a): ". . . the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, . . . shall not exceed 15 percent of the actual period of confinement *for any person specified in subdivision (a)*." (Italics added.) Turning to section 2933.1, subdivision (a) for that specification, we learn it deals only with persons "convicted of a felony offense listed in section 667.5 . . . ." Thus, subdivision (c) essentially reads: ". . . the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, . . . shall not exceed 15 percent of the actual period of confinement [for any person convicted of a felony offense listed in section 667.5]." Aguirre is such a person, and was correctly awarded no more than a 15 percent credit for his presentence custodial time.

In other words, section 2933.1, subdivision (c)'s reference to subdivision (a) does not include that portion speaking of worktime credit. To interpret it as such violates the clear meaning of the statute. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].) A further look into these provisions sheds light on the point.

Section 2933, a purely postsentence statute, provides a one-half reduction for participating in authorized work programs provided at state prisons. In 1994, the Legislature added section 2933.1, which specifically addressed those convicted of violent felonies. Section 2933.1, subdivision (a) allows

*postsentence credits* for participating in authorized work programs, defined in section 2933. Because the participant is a violent offender, however, he receives only a 15 percent reduction of time rather than the one-half normally allowed under section 2933. Subdivision (c), on the other hand, addresses *presentence credits* for violent offenders. Again, the maximum credit one can receive is only 15 percent. The reduction is calculated from the time actually served in confinement. If one is a violent offender, he need go no further than section 2933.1 to determine his pre- and post-sentence credits.

Aguirre's argument ignores the interlocking application of these provisions. His interpretation of subdivision (c) would require us to adopt more of subdivision (a) than necessary. Since subdivision (c) already explains that it relates to presentence confinement, there is no need to look to subdivision (a) for anything more than a definition of what persons are subject to subdivision (c). To adopt the next phrase of section 2933.1, subdivision (a), which refers to worktime credit under section 2933, creates an unnecessary ambiguity.

Aguirre next argues his sentence includes a three-year enhancement for personal use of a firearm, which is served prior to the indeterminate fifteen years to life sentence for murder in the second degree. Since the personal use conviction is served first, and it is not listed under section 667.5 as a violent felony, Aguirre contends section 2933.1 is inapplicable to him. Instead, his credits should be calculated pursuant to section 4019, a more liberal provision for determining credits. "However, the language of section 2933.1 does not support his position. The statute applies '[n]otwithstanding Section 4019 or any other provision of the law' and limits to 15 percent the maximum number of conduct credits available to 'any person who is convicted of a felony offense listed in Section 667.5.' That is, by its terms, section 2933.1 applies to the offender not the offense and so limits a violent felon's conduct credits irrespective of whether or not all his or her offenses come within section 667.5. . . ." (*People* v. *Ramos* (1996) 50 Cal.App.4th 810, 817 [58 Cal.Rptr.2d 24].)

In his final argument Aguirre contends the denial of presentence conduct credits violates his constitutional right to equal protection. He cites *People* v. *Sage* (1980) 26 Cal.3d 498, 502, 506-507 [165 Cal.Rptr. 280, 611 P.2d 874], presumably for the proposition that one earns less credit while in jail than in state prison, resulting in an unfair advantage to those who can afford bail. The disparity occurs because the credit earned in prison is based upon the total term of imprisonment whereas the credit earned in jail is derived from the actual time served. The argument has been rejected by this court previously. In *People* v. *Ramos, supra,* 50 Cal.App.4th at pages 821-824, we

explained, ". . . a violent felon confined in a local detention facility prior to sentencing is not similarly situated for equal protection purposes to one serving a term in state prison and enrolled in a qualifying work program. [Citations.]" Establishing disparate treatment between two similarly situated groups is, of course, a prerequisite to a meritorious equal protection claim. (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) Aguirre fails to meet that threshold challenge. Accordingly, we reject his constitutional claim.

## DISPOSITION

Judgment affirmed.

Vartabedian, J., and Wiseman, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 29, 1997.