105 Cal.Rptr.2d 365 (2001)
87 Cal.App.4th 1446
The PEOPLE, Plaintiff and Respondent,
v.
Andres Juarez CASTRO, Defendant and Appellant.
No. E026619.
Court of Appeal, Fourth District, Division Two.
March 28, 2001.
As Modified on Denial of Rehearing April 23, 2001.
Review Granted July 11, 2001.
*366 A.M. Weisman, under appointment of the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Nancy L. Palmieri, Acting *367 Supervising Deputy Attorney General, and Leslie B. Fleming, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
HOLLENHORST, J.
Following a jury trial, defendant Andres Juarez Castro was convicted of one count of first degree murder and it was found true that he personally used a deadly weapon in the commission of that offense. (Pen.Code, §§ 187, subd. (a) & 12022, subd. (b)(1).[1]) He was sentenced to an indeterminate term of 25 years to life, plus a consecutive determinate term of one year for the enhancement. He appeals contending that the judgment must be vacated on grounds of double jeopardy, the trial court erred in instructing the jury, and there were errors in his sentence.

I

FACTS
Shortly after midnight, in the early morning hours of October 7, 1997, the body of 81-year-old Enrique Baca was found by firefighters responding to a fire. Defendant had stabbed Mr. Baca numerous times on the right side of the neck causing hemorrhaging and death. Defendant killed Mr. Baca because he would not disclose where defendant's wife and child could be found.

II

DOUBLE JEOPARDY
During defendant's arraignment on June 1, 1998, a public defender was appointed as his counsel. The matter was originally called for trial on August 13. On August 31, the fifth day of trial, the public defender declared a conflict. The court relieved him and appointed the firm of Ponce and Ritter to represent defendant.
On September 1, 1998, defense counsel stated that a 120-day continuance would be necessary to prepare for trial. After learning that alternate available counsel could not prepare for trial any more rapidly, the court confirmed the appointment of Ponce and Ritter. Defense counsel did not make a motion for mistrial. Over defendant's objection, the trial court declared a mistrial. Subsequently, defendant was tried and convicted.
On appeal, defendant contends the mistrial was without legal necessity and his retrial placed him twice in jeopardy, in violation of the Fifth Amendment to the federal Constitution, as applicable to the states through the Fourteenth Amendment, and article I, section 15, of the California Constitution.[2] "The constitutional guarantees against double jeopardy protect a defendant's `"valued right to have his trial completed by a particular tribunal"' and his interest in not being subjected to successive prosecutions for the same offense. [Citations.] `The underlying idea, one that is deeply ingrained in at *368 least the Anglo American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' [Citation.]" (People v. Marshall, supra, 13 Cal.4th 799, 824-825, 55 Cal. Rptr.2d 347, 919 P.2d 1280.)
However, when a mistrial is declared because of "legal necessity," the double jeopardy clauses of the state and federal Constitutions do not bar a second trial for the same offense. (People v. Gibbs (1986) 177 Cal.App.3d 763, 765, 223 Cal.Rptr. 194.) "It is well settled that legal necessity for a mistrial `arises from an inability of the jury to agree, or from physical causes beyond the control of the court, such as the death, illness, or absence of judge or juror, or of the defendant.' [Citation.] The absence of counsel has also qualified as legal necessity for granting a mistrial. [Citation.] In [People v. McNally (1980) 107 Cal.App.3d 387, 393, 165 Cal.Rptr. 715], the court held that legal necessity required a mistrial when the defendant's attorney learned on the third day of trial that a conflict of interest existed such that he could no longer represent the defendant.... The court concluded that since the conflict could prejudicially affect the defendant's right to effective counsel, the defendant's consent to the mistrial was unnecessary. [Citation.] Because legal necessity required the mistrial, a retrial was not barred. [Citation.]" (People v. Coleman (1992) 9 Cal.App.4th 493, 496, 11 Cal.Rptr.2d 800.)
In this case, the trial court relied on the McNally court's holding and found that a 120-day continuance would "present extremely difficult problems" for the jury. Thus, it concluded that legal necessity required a mistrial. We agree. In reaching our decision, we have considered defendant's emphasis on the fact that no testimony had been heard and no opening statements had been given. Nonetheless, the jury had been told that their duty would only take them to mid-October, 1998, at the latest. Factoring in the 120day continuance, and assuming the best case scenario, the trial would not begin until January 1, 1999. With a six-week estimate, the jury would not be able to complete their jury duty until mid-February, at the earliest. Nonetheless, defendant would request that the trial court keep the jury without consideration of the problems which jurors would inevitably face due to their extended service. We find no constitutional basis for this request.
As the McNally court observed, "Recalling the sworn jury after such a delay would present extremely difficult problems. Typically, at the commencement of a trial, the jury is advised of the estimated length of the trial. An interrupted trial would, of necessity, contravene any representations made as to how long jurors would have to be available. Furthermore, depending on the length of the recess necessary, when the trial finally resumed, it might be necessary either to reread the testimony of witnesses already sworn or actually to have them retestify." (People v. McNally, supra, 107 Cal.App.3d 387, 393, 165 Cal.Rptr. 715.)
Jury duty takes individuals away from their lives, their businesses, their jobs, and their homes. However, to limit the amount of disruption jury duty demands of each juror's life, voir dire allows jurors to be qualified for a specific period of time, namely, the length of time the trial is anticipated to take within the immediate future. Likewise, jurors are made aware of the type of case being tried and are evaluated for fairness, questioned, and approved to sit as the jury deciding a defendant's future. The jurors in this case were so qualified as of September 1, 1998. It was represented to them that their jury duty would end on or before mid-October. *369 Nonetheless, these jurors, like all jurors, have commitments in their lives beyond the original time estimate. Regardless of these future commitments, defendant argues that these jurors should be required to put their lives on permanent hold until his fate has been decided. We strongly disagree.
Jurors face enough of a hardship when they set aside their plans, and lives, for the qualified period of time necessary for the trial. Nonetheless, they bear that hardship as part of their civic duty and give the guarantee that they will be available for the time requested. While short continuances may, and do, occur during trials, we cannot accept a request that would require the jurors to subordinate, for a minimum of four months in this case, their obligations of daily life to newly appointed counsel's need to prepare. We find that any substantial continuance beyond the qualified period of time for any reason results in a loss of the guarantee of availability which was given by the jurors, as well substantial imposition on their future plans. Jurors are not pawns in the judicial process to be treated insensitively and without regard to the realities of their situation.
"The continuing viability and vitality of the jury process depends on public support and participation by a diverse and representative cross-section of our communities." (People v. Rhodes (1989) 212 Cal. App.3d 541, 548, 261 Cal.Rptr. 1.) We have pushed the limit to which jurors are comfortable with accepting their civic duty to serve as jurors. "[T]he increasing scrutiny being placed on prospective jurors may make it more difficult to obtain willing participants in this vital civic duty. Prospective jurors often are subjected to tedious voir dire which delves into the most personal aspects of their lives. In some cases, jurors are required to fill out lengthy, detailed questionnaires which seek to expose their innermost thoughts. Occasionally, parties employ experts to analyze the backgrounds and personalities of prospective jurors to assess their suitability for jury duty in a specific case. Most trial judges undoubtedly would confirm that prospective jurors often feel as if they are on trial, and some jurors openly express resentment of the process." (Ibid.)
Given the length of time necessary for the continuance in this case, the trial court found that such continuance would "present extremely difficult problems" for the jury, and correctly concluded that legal necessity required a mistrial. Accordingly, we reject defendant's argument to the contrary.

III[**]

IV

CUSTODY CREDITS
"In general, a defendant receives what are commonly known as conduct credits toward his term of imprisonment for good behavior and willingness to work...." (People v. Thomas (1999) 21 Cal.4th 1122, 1125, 90 Cal.Rptr.2d 642, 988 P.2d 563.) Defendant's ability to earn conduct credits is governed by section 190. At sentencing, defendant was given 821 days of credit for actual time in custody and an additional 123 days (15 percent of the 821 days pursuant to § 2933.1) for conduct credits. He contends that he is entitled to 50 percent of the 821 days for conduct credit because the 15 percent limitation imposed by section 2933.1 does not apply to sentencing under section 190, subdivision (a). We disagree.[5]
Section 190 was considerably revised in 1978 by initiative measure. At the time defendant committed his crimes (1997), section 190, which prescribed the penalty for murder, provided, in relevant part, "Except as provided in subdidivion (b), *370 Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3[6] shall apply to reduce any minimum term of 15, 20, or 25 years in the state prison imposed pursuant to this section, but the person shall not otherwise be released on parole prior to that time." (Former § 190, subd. (a) (Prop. 7, as approved by voters, Gen. Elec. (Nov. 7, 1978)); 1987, ch. 1006, § 1 (Prop. 67, as approved by electorate, Prim. Elec. (June 7, 1988)), operataive June 8, 1988; 1993, ch. 609, § 3 (Prop. 179, as approved by electorate, Prim. Elec. (June 7, 1994)).) In other words, a person convicted of murder would get the credits defined in Article 2.5, but no others. In 1978, Article 2.5 consisted of sections 2930, 2931, and 2932.
California's Constitution provides that the Legislature cannot modify a statute enacted by initiative without voter approval, unless the initiative statute permits otherwise. (Cal. Const, art. II, § 10, subd. (c).) Section 190 does not allow such a modification by the Legislature without voter approval. (People v. Ruiz (1996) 44 Cal.App.4th 1653, 1658, 52 Cal.Rptr.2d 561; In re Oluwa (1989) 207 Cal.App.3d 439, 447, 255 Cal.Rptr. 35.) In 1994, without voter approval, the Legislature enacted section 2933.1 as part of Article 2.5, limiting conduct credits to 15 percent for persons convicted of crimes listed in section 667.5, including murder.[7] The determinative issue here is whether, for purposes of article II, section 10, subdivision (c) of our state Constitution, the Legislature's addition of section 2933.1 to Article 2.5, to which section 190 refers, impermissibly modifies section 190.[8] For the reasons set forth below, we conclude that it does not.
First, extant authority indicates that sentences for murder are subject to the 15 percent limit on conduct credits. (See, e.g., People v. Sylvester (1997) 58 Cal. App.4th 1493, 1495-1497, 68 Cal.Rptr.2d 716; People v. Aguirre, supra, 56 Cal. App.4th 1135, 1138-1141, 66 Cal.Rptr.2d 77; People v. Camba (1996) 50 Cal.App.4th 857, 862-867, 57 Cal.Rptr.2d 907.) While these cases do not directly address the issue we discuss here, resolving the issue as defendant contends it should be resolved would require that we simply ignore this body of case law.
Second, while section 190 cannot be amended without voter approval, the Legislature did not directly amend section 190 when it enacted section 2933.1. Defendant's reliance on In re Oluwa, supra, 207 Cal.App.3d 439, 255 Cal.Rptr. 35, for the contrary view is certainly understandable and to some extent reasonable, but as we point out below, distinguishable. In Oluwa, the Legislature enacted section 2933, placing it in Article 2.5, to allow conduct credits to reduce a sentence by up to one half. The court concluded that the Legislature could not, without voter approval, enact legislation allowing greater conduct credits than provided for by Article 2.5 in 1978. The court based its conclusion on three points, the second two of which are distinguishable with regard to section 2933.1.
The Oluwa court first found, based on established rules of statutory construction, that the reference to Article 2.5 was a reference to that article as it existed in 1978, not as it would later be amended. Defendant also makes that point here. Section 190's internal references to Article 2.5, which would encompass *371 the credits provisions, were not intended to freeze the credits provisions in time with relation to section 190. Section 190 referred to Article 2.5, but Article 2.5 is not part of section 190. Generally, statutes, even initiative statutes, operate prospectively. The reference to Article 2.5 in section 190 did not guarantee to murderers that their conduct credits could never be altered; rather, legislative reference to Article 2.5 must be understood to refer to the contents of Article 2.5, as it may happen to provide from time to time in the present and the future. "[S]tatutes operate prospectively, although postenactment circumstances and laws change. (2B Sutherland, Statutory Construction (5th ed.) § 49.02, pp. 2-3.)" (Willis v. State of California (1994) 22 Cal.App.4th 287, 292, 27 Cal.Rptr.2d 413.) Nonetheless, the holding in Oluwa relies on the following additional factors that are not present here, and so this first point is not of itself determinative.
The Oluwa court's second point involves a review of the legislative analysis of Proposition 7, which advised voters that, even with the conduct credits available through Article 2.5, murderers would serve at least two-thirds of the determinate portion of their sentences before becoming eligible for parole. The court thus found that "the electorate clearly intended" those convicted of murder to serve two-thirds of the determinate portion of their sentences before becoming eligible for parole and that the Legislature was not authorized to decrease the sentence actually served below that fraction. (In re Oluwa, supra, 207 Cal.App.3d 439, 445, 255 Cal.Rptr. 35.) In other words, the Oluwa court determined that, because the voters' intent was that murderers serve at least two-thirds of their sentences, the Legislature may not revise Article 2.5 to increase conduct credits. However, the court did not determine, as we do here, whether the Legislature may decrease conduct credits.
The Oluwa court's third and related point is that the Legislature may not do indirectly, by amending Article 2.5, what it could not do directly by amending section 190. However, that court's conclusion that section 2933 was an indirect amendment of section 190 is based on the above discussed premise that the voters intended to set a minimum amount of time to be served by murderers. That argument does not apply here because we could find no indication that the Proposition 7 voters intended to set a maximum amount of time to be served by murderers. In other words, while the voters apparently intended to guarantee that murderers' conduct credits could never be increased beyond what was allowed in 1978, we conclude there is no indication they intended to guarantee that their conduct credits could never be decreased.
We thus hold that the Legislature may reduce the conduct credits for a murder sentence without voter approval. Of course, because defendant was also sentenced to a determinate term, which must be served first (§ 669; In re Monigold (1983) 139 Cal.App.3d 485, 493, 188 Cal. Rptr. 698), the presentence custody credits, limited to 15 percent, would be applied to that term and defendant does not contend otherwise. (People v. Aguirre, supra, 56 Cal.App.4th 1135, 1141, 66 Cal.Rptr.2d 77 [§ 2933.1 applies to both murder sentence and to three-year weapon enhancement]; People v. Ramos (1996) 50 Cal. App.4th 810, 817, 58 Cal.Rptr.2d 24 [§ 2933.1 limits the credits for "any person" convicted of a violent felony and thus applies to the consecutive term as well].)

V[***]

VI

DISPOSITION
The judgment is modified to reflect defendant has been fined in the sum of $5,200 pursuant to section 1202.4 and *372 $5,200 pursuant to section 1202.45, with the latter stayed pending successful completion of parole. The clerk of the superior court is ordered upon issuance of the remittitur to prepare a corrected abstract of judgment as set forth in this opinion and forward it to the Department of Corrections. In all other respects, the judgment is affirmed.
RAMIREZ, P.J., and WARD, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and V.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] "Defendant raises his double jeopardy claim for the first time on appeal, and the Attorney General argues the argument is therefore waived and should not be considered on appeal. If, however, a plea of former jeopardy had merit and trial counsel's failure to raise the plea resulted in the withdrawal of a crucial defense, then defendant would have been denied the effective assistance of counsel to which he was entitled. (People v. Belcher (1974) 11 Cal.3d 91, 96, 113 Cal.Rptr. 1, 520 P.2d 385 . . . (Belcher) [acknowledging general rule of waiver, but addressing double jeopardy argument on direct appeal and concluding trial counsel's failure to timely raise plea of former jeopardy constituted a denial of effective assistance of counsel]; see Strickland v. Washington (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674....) Consequently, although the Attorney General is technically correct in arguing the issue was waived, as in Belcher we nevertheless must determine whether such a plea would have had merit." (People v. Marshall (1996) 13 Cal.4th 799, 824, fn. 1, 55 Cal.Rptr.2d 347, 919 P.2d 1280.)
[**] See footnote *, ante.
[5] Defendant also alleges, and respondent concedes, that he did not waive the right to appeal this issue. We agree. (People v. Aguirre (1997) 56 Cal.App.4th 1135, 1139, 66 Cal.Rptr.2d 77.)
[6] Herein referred to as Article 2.5.
[7] Section 2933.1 provided, "(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in Section 667.5 [ (murder) ] shall accrue no more than 15 percent of worktime credit, as defined in Section 2933 .... [¶] (c) Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in ... a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." (Stats.1994, ch. 713, effective Sept. 21, 1994.)
[8] This issue is currently pending before our Supreme Court in People v. Cooper, 105 Cal. Rptr.2d 787, 20 P.3d 1083, review granted Feb. 14, 2001.
[***] See footnote *, ante.