Filed 2/20/15  P. v. Torres CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MANDEN TORRES,<br><br>    Defendant and Appellant. | F066565<br><br>(Super. Ct. No. VCF249627)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Manden Torres was charged with attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; count 1), shooting at an inhabited dwelling (§ 246; count 2), and unlawful possession of a firearm (§ 12021, subd. (e);[2] count 3). The information also alleged: (1) as to counts 1, 2, and 3, defendant committed the offenses while he was released on bail for another crime (§ 12022.1), committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)), and suffered three prior juvenile adjudications (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)); (2) as to counts 1 and 2, defendant personally used a firearm (§ 12022.53, subd. (b)), defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)); and (3) as to count 2, a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).

On February 22, 2012, the jury convicted defendant on all three counts. It further found: (1) as to counts 1, 2, and 3, defendant committed the offenses while he was released on bail for another crime and suffered three prior juvenile adjudications; and (2) as to counts 1 and 2, defendant committed the offenses for the benefit of a criminal street gang, defendant personally and intentionally discharged a firearm, and a principal personally and intentionally discharged a firearm.

On January 4, 2013, the trial court sentenced defendant to 45 years to life, plus a 20-year firearm discharge enhancement, on count 2; 29 years to life, plus a 10-year firearm use enhancement and a 10-year gang enhancement, on count 1, to be served consecutively; and four years on count 3, to be served concurrently. The court awarded 666 days of presentence credit for actual time served.

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     Effective January 1, 2011, and operative January 1, 2012, section 12021, subdivision (e), was repealed (Stats. 2010, ch. 711, § 4) and reenacted without any substantive change as section 29820 (Cal. Law Revision Com. com., Deering's Ann. Pen. Code (2012 ed.) foll. § 29820, p. 960).

On appeal, defendant contends:  (1) firearm and gang enhancements under sections 186.22 and 12022.53, respectively, cannot both be imposed on either the count 1 sentence or the count 2 sentence; (2) the abstracts of judgment must be corrected to show that the count 1 sentence was determinate, the count 2 firearm discharge enhancement was 20 years, and the count 3 sentence was concurrent; (3) he was entitled to additional presentence credit; (4) the jury's on-bail finding as to counts 1, 2, and 3 should be vacated; and (5) use of a prior, nonjury juvenile adjudication to enhance a sentence for a subsequent adult felony offense is unconstitutional.

We conclude:  (1) defendant was subject to both a firearm enhancement under section 12022.53 and a gang enhancement under section 186.22 on counts 1 and 2; (2) the sentence imposed on count 1 was indeterminate, but the abstracts of judgment must be corrected to show that the count 2 firearm discharge enhancement is 20 years and the count 3 sentence is concurrent; (3) defendant was entitled to additional presentence credit; (4) the jury's on-bail finding does not need to be vacated; and (5) use of a prior, nonjury juvenile adjudication to enhance a sentence for a subsequent adult felony offense is constitutional.  The judgment shall be modified accordingly and, as so modified, affirmed.

**STATEMENT OF FACTS**

**I.      The shooting**

a.  *Francisco Guerrero*

On March 9, 2011, Guerrero and two friends[3] were drinking and listening to music outside of his house on 510 South E Street in Tulare, California, sometime between 12:45 p.m. and 1:00 p.m. when a group of young men approached and fired two shots at

---

[3]      Guerrero's friends wore either blue pants or blue shorts.

3.

them.[4]  Guerrero, who had dived to the ground after the first gunshot, stood up and watched at least four males flee northbound on South E Street and then eastbound on West Sonora Avenue.  Thereafter, police arrived and transported Guerrero and his wife, Rosalie P., to the 300 block of South I Street, where four individuals—defendant, Stephen T., Gabriel M., and Joey V.—were detained for a field show-up.[5]  Guerrero identified Stephen as "the one that shot first" and the other three as participants in the shooting.

b.  *Rosalie P.*

Rosalie was indoors when she heard the first gunshot.  She hurried to the front door and saw defendant fire another shot at her husband and his friends.  Following the second gunshot, defendant and at least three other males ran northbound on South E Street and turned right on West Sonora Avenue.  At the field show-up, Rosalie identified defendant, who wore a gray sweatshirt, as the shooter.

c.  *Angelica A.*

Sometime between 12:00 p.m. and 1:00 p.m., Angelica was speaking to a neighbor on South G Street, between West Owens Avenue and West Sonora Avenue, when she heard gunfire.  She then observed "about four or five guys running down Owen[s]." Angelica recognized one of the young men as Stephen, her former classmate.

d.  *Kevin Meier*

Meier, a construction worker, had exited a trailer on 630 South E Street, near the corner of South E Street and West Alpine Avenue, when he saw four males about 500 to

---

**4**     One of the bullets ricocheted off the arm of a chair and struck Guerrero's fence while the other was deflected into the backyard by the fence.

**5**     To be consistent with the record, we use the first name and last initial to identify certain individuals.

600 feet away. One of them pulled out a gun and fired two shots "into a house on E Street." The shooter wore a gray hooded sweatshirt.

## II. Arrests, searches, and interviews

### a. *Officer Norma Martinez*

On March 9, 2011, at approximately 12:42 p.m., Martinez responded to a call of a shooting near West Sonora Avenue and South E Street. After she arrived on the scene, she drove around the neighborhood in search of the suspects. Martinez was "flagged down" on the corner of West Alpine Avenue and South E Street by a construction worker, who informed her that the perpetrators fled eastbound on West Sonora Avenue. Martinez headed northbound on South E Street, turned right on West Sonora Avenue, and turned left on South G Street. Near the corner of South G Street and West Owens Avenue, three bystanders—two adults and one female minor—reported that several individuals ran on West Owens Avenue. Martinez continued eastbound on West Owens Avenue, turned left on South I Street, and stopped in front of 339 South I Street, where she contacted defendant, Stephen, Gabriel, and Joey,[6] who were "sitting … by the porch area" and matched the suspects' descriptions. During a search of the young men and the porch area, which contained an old sofa, Martinez came across a gray hooded sweatshirt underneath the sofa cushion. Defendant stated that the sweatshirt belonged to him and he removed it "because he was hot."

At the police department's booking facility, Martinez and other law enforcement personnel administered gunshot residue (GSR) kits. As she was finishing a kit for Gabriel, she heard a "buzz," looked up, and saw Gabriel attempt to operate a cell phone. Martinez took the phone and read the incoming text message "[N]o, really, when[?]" and

---

[6] Martinez testified that she knew the four young men through her capacity as a school resource officer.

the preceding outgoing message "Ha, the little homey just bucked on some Scraps." She collected a red bandana from Gabriel.

b. *Steven Dowell*

Dowell, a criminalist, analyzed the GSR kits, found residue on Stephen, and did not find residue on defendant, Gabriel, and Joey. He described the manner in which GSR is deposited:

> "One can receive [GSR] in a number of ways…. [I]f my hand represents a handgun that's going to be discharged, when it's discharged, particles can certainly leak out of the muzzle end of the firearm …. [I]n other types of firearms[,] whether they're revolvers or semiautomatics, particles can leak out from either the ejection port or the cylinder gap between the … front of the cylinder jacket of the muzzle. They can also leak out of the trigger housing area of the firearm so … if this firearm is going to be discharged[,] anywhere from touching this firearm to as great a distance as two and a half feet to the side, top, back or bottom or zero to 14 feet in the muzzle direction is an area which might contain [GSR] when this firearm is discharged. So if I discharge this firearm here, someone close by or within those distances might receive that [GSR] although they didn't actually discharge the firearm.
>
> "Additionally if I handle a previously discharged firearm that has not been … surgically cleaned, I could transfer those particles to my hand simply from handling the firearm, not from discharging it. [¶] A third possibility is I've got [GSR] on my hands for some reason and I touch somebody else's hand or other parts of their person. I could transfer those particles. [¶] … [¶]
>
> "… [E]ach firearm is going to leak a different amount of [GSR]. It generally depends on the quality of the firearm[,] … how many gaps there are, … how much it leaks. And each firearm may leak a different amount of [GSR] from discharge to discharge. So there are a couple of variables that are active in, in answering that question."

Dowell added that GSR is transferable:

> "[GSR] can be removed[,] but it's like any other kind of dirt. It's like how dirty am I. If I'm really dirty, even if I wash my hands, I still might have some dirt on my hands. But … if I discharge my weapon just a few times and I'm sort of lightly contaminated with [GSR], washing my hands or[,]

6.

without intention, just wiping my hands together or bringing my hands in contact with another object … can transfer those particles ….”

He pointed out that a person who fires a handgun does not always exhibit GSR:

"[W]e run about a six percent negative rate for all calibers above [and below] 25 caliber[,] so … it is possible on rare occasions to discharge a firearm and not have any [GSR] on your hands ….  [¶] … [¶]  … In 25 caliber handguns, … we actually get about a 25 percent negative rate ….  [¶] … [¶]

"… [A] finding of no particles of [GSR] is inconclusive for one of the following reasons[.]  [T]he person may not have discharged a firearm.  [He] may have discharged a firearm[,] but no particles landed on the clothing….  I could discharge a firearm in a particular way that maybe protects my clothing from receiving [GSR] or I discharge a firearm, there are particles on my clothing[,] but somehow I do something with my clothing to remove those particles before the sample actually gets collected.”

c.  *Detective Jesus Guzman*

Guzman interviewed the young men individually.

Defendant denied being involved in the shooting.  He asserted that he was at his house, “barely woke up,” and walked with Stephen, Gabriel, and Joey to Joey's house.[7]

Stephen “was giggling and kind of taking [the interview] like a joke.”  He possessed a red bandana.

Gabriel admitted that he was a “northern gang member.”  Prior to the shooting, he, defendant, and Stephen “walked with Joey” “because … somebody was going to mess with him” and they “[w]ere … going … to help him.”  Gabriel mentioned that “some big dudes” called them “Busters.”  He admitted that he and the other three “ran after the

---

**7**    The jury listened to a recording of defendant's interview.

7.

shooting" and he sent the text message "[T]he little hom[ey] just bucked on some Scraps."[8]

Joey remarked that he was "jumped into the West Side Locos gang." Prior to the shooting, he was walking with his four-year-old niece to pick up his girlfriend when he was "approached by a bigger guy who told him, 'This is Wicked.'" Joey also saw "some guy come out of a pad drinking" and heard him say, "The Wicked gang."[9]

## III. Gang evidence

Guzman, a gang expert, testified that approximately 350 to 400 Norteños reside in Tulare. They wear red apparel and identify with the number 14 because the 14th letter of the alphabet, N, stands for "Nuestra Familia," the prison gang to whom they and other "northern gangs" pledge allegiance. Norteños primarily engage in murder, attempted murder, shootings, robberies, and drug sales.[10] Their chief rivals are Sureños, who wear blue attire, are loyal to the "Mexican Mafia" prison gang, and identify with the number 13 because the 13th letter of the alphabet, M, stands for Mexican Mafia. "Wicked Ass Sureños," also known as Wicked, is a Sureño sect in Tulare.

---

[8] At trial, Gabriel testified that he was a "Northerner" on March 9, 2011, but "[n]ot anymore." He clarified that "Busters" was a term of "disrespect to Northerners," "Scraps" was "[a] disrespectful word to Southerners," and "bucked" meant "[s]hot." Gabriel recalled that "there was a shooting" on March 9, 2011, but did not remember "at all what happened that day."

[9] At trial, Joey testified that he was "still a northern gang member." On March 9, 2011, at around 7:00 a.m., he was walking by himself to school when "somebody said Wicked" to him. Sometime after 12:00 pm, as Joey was walking home, he "heard gunshots" and "took off running." He subsequently called defendant, Stephen, and Gabriel to "come to [his] house and hang out." Joey denied knowing what "Wicked" meant.

[10] Guzman confirmed that validated Norteños have been convicted of attempted murder and assault with a deadly weapon, inter alia.

Guzman opined that defendant was a Norteño based on documentation showing that he admitted being a "Northerner," associated with Norteños, engaged in misconduct with such individuals, wore red clothing, threatened to kill a person if that person testified against a Norteño, and referred to Sureños as "Scrap[s]"[11] and his enemies. Likewise, Guzman opined that Stephen was a Norteño based on documentation showing that he admitted being a "northern gang member," associated with Norteños, wore red clothing, threatened "snitches," and fought Sureños who called him "Buster."[12]

In response to the prosecutor's hypothetical questions, Guzman opined that four Norteños who come together to locate a Sureño—who explicitly identified himself to one of them—and shoot at three Hispanic men who appear to be Sureños do so for the benefit of the gang and with the intent to promote, further, or assist in criminal conduct:

> "[F]irst of all, you have one Northerner that gets approached by a rival gang member and is told[,] [']Wicked[']…. [I]n the gang culture[,] respect is everything. If you get disrespected[,] especially by a rival gang member[,] and you don't do anything about it, it's not good in a gang. You're going to be beaten up. You're going to get dropped out of the gang. You need to do something about that. So respect is big. It's key to the gangs.
>
> "So if this gang member is approached and he's … told[,] [']H]ey[,] this is Wicked right here[,'] … he's got to go and gather up … some more friends …. [I]t's like one team against another team …. [I]f you don't have numbers …, you don't have anything[,] so … you got to get somebody else …. Usually it's … somebody older that knows what's going on.
>
> "So by … getting together and forming a plan and then walking back to the area[,] … they return to this area looking for some vengeance …. [T]hey see somebody wearing … blue …, Hispanic[,] [and a]ppear[ing] to be a southern gang member and open fire and then just run[] and … brag[]

---

**11** Guzman explained that "Scrap" "is a derogatory term used by northern gang members to disrespect southern gang members." (See *ante*, fn. 8.)

**12** Guzman explained that "Buster" "is a derogatory term used by southern gang members to disrespect a northern gang member." (See *ante*, fn. 8.)

about it -- gang members brag about what they do, brag and text[] about their hom[eys] bucking on some Scraps.

"All that is for the gang.  All that is to benefit their gang because they're not going to let their gang be disrespected ….  Each one of them represents the gang.  If nothing is done about it, there are going to be serious repercussions by other gang members.  [¶] … [¶]

"… [G]ang members … can't just be gang members and … do nothing.  They all have to … earn the respect from … fellow gang members and the more violent you are the more respect you're going to get.  [¶] … You need to put in work.  You need to be active in the gang.  You need to go out and do things for the gang that includes … going out and taking care of business like this….  Retaliation is big in the gang so … they're working for the gang."

Guzman also noted that gang members do not ordinarily testify against one another:

"Testifying against a … gang member is like treason….  [Y]ou're a traitor ….  [O]ne of the … biggest mistakes you can make in the gang is … testifying against a rival or a fellow gang member.  Even rival gang members don't testify against each other[,] but when you testify against your own home boy, your own gang member, …. it's a big no no in the gang."

## DISCUSSION

**I.  Defendant was subject to both a firearm enhancement under section 12022.53 and a gang enhancement under section 186.22 on counts 1 and 2**

a. *Background*

In summation, the prosecutor theorized that (1) Stephen fired the first shot at Guerrero and his friends while defendant aided and abetted in the commission of the shooting; and (2) defendant fired the second shot at Guerrero's house.  The jury, inter alia, convicted defendant of attempted murder (count 1) and shooting at an inhabited dwelling (count 2) and determined that he personally and intentionally discharged a firearm in the commission of these gang-related crimes.

10.

At the January 4, 2013, sentencing hearing, the trial court addressed the public defender's memorandum pertaining to firearm enhancements on count 1:

> "I do not believe … that [defendant] personally used a firearm in relation to the crime as charged in Count 1…. [T]hat's my intended ruling on that matter. [¶] … [¶] … I'm going to attempt to stay [the enhancement]."

The court then pronounced the sentence:

> "[A]s to Count 2[,] … defendant's committed to state prison for the term of 15 years to life and that will be made 45 to life pursuant to the strikes and he'll receive an additional 20 years pursuant to … [s]ection 12022.53[, subdivision (c),] which makes it a term of 45 [years] to life plus 20 years….
>
> "As to Count 1[,] he's committed to state prison for the term of nine years[,] which is the aggravated term[,] plus ten years pursuant to the [section] 12022.53[, subdivision (b),] allegation and ten years pursuant to the gang allegation [under section] 186.22[, subdivision (b)(1)(C),] so the term on Count 1 will be 29 years to life and that will be consecutive to Count 2.
>
> "As to the special allegation[,] I think it is [section] 12022.53[, subdivision (c),] the court is staying that allegation because the court does not believe that … defendant personally fired the firearm in Count 1."

The public defender challenged the firearm use enhancement on count 1:

> "[T]he court imposed ten years with respect [to section] 12022[.]53[, subdivision (b),] which is a princip[al] being armed during the commission of the offense. I believe that the ten year gang enhancement cannot be imposed because that would be double counting[,] so I think that it should just be as to Count 1… [¶] … [¶] … for a term of ten years consecutive."

The court proclaimed, "I'm not changing anything. I'[m] leaving it the way it is."

b. *Analysis*

Section 12022.53, also known as the "'10-20-life'" law (*People v. Perez* (2001) 86 Cal.App.4th 675, 678), "imposes increasingly severe sentence enhancements for firearm use in the commission of certain felonies" (*People v. Brookfield* (2009) 47 Cal.4th 583, 589 (*Brookfield*); accord, *People v. Perez*, *supra*, at p. 680). Qualifying offenses include attempted murder (§ 12022.53, subd. (a)(1) & (18)) and "[a]ny felony punishable by

11.

death or imprisonment in the state prison for life" (*id.*, subd. (a)(17)). Discharge of a firearm at an inhabited dwelling (§ 246), if committed for the benefit of a criminal street gang, is punishable by a life term (§ 186.22, subd. (b)(4)) and thereby a qualifying offense under the 10-20-life law (*Brookfield*, *supra*, at p. 591).

A defendant who "personally uses a firearm" in the commission of a qualifying offense "shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years." (§ 12022.53, subd. (b).) A defendant who "personally and intentionally discharges a firearm" in the commission of a qualifying offense "shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years." (*Id.*, subd. (c).)

"Ordinarily, section 12022.53's sentence enhancements apply only to *personal* use or discharge of a firearm in the commission of a statutorily specified offense, but when the offense is committed to benefit a criminal street gang, the statue's additional punishments apply even if … the defendant did not personally use or discharge a firearm but another principal did." (*Brookfield*, *supra*, 47 Cal.4th at p. 590; accord, § 12022.53, subd. (e)(1).) "[W]hen another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a criminal street gang … in addition to an enhancement imposed pursuant to' section 12022.53." (*Brookfield*, *supra*, at p. 590, quoting § 12022.53, subd. (e)(2).) On the other hand, "[a] defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53." (*Brookfield*, *supra*, at p. 590; accord, § 12022.53, subd. (e)(2).)

Defendant claims the trial court "erred by using both a firearm enhancement and a gang allegation in imposing sentence on either count[] 1 or count 2." We disagree. First, as to count 2, defendant was convicted of shooting at an inhabited dwelling for the benefit of a criminal street gang and sentenced to a life term pursuant to the alternate

penalty provision in section 186.22, subdivision (b)(4). (See *Brookfield*, *supra*, 47 Cal.4th at pp. 591-595 [the term "enhancement" as used in § 12022.53, subd. (e)(2), encompasses both sentence enhancements adding to the base term of imprisonment and alternate penalty provisions for the underlying offense].) The jury determined that defendant personally and intentionally discharged a firearm in the commission of this offense and the court did not disturb this finding when it pronounced the count 2 sentence. Hence, based on section 12022.53, subdivision (e)(2) and *Brookfield*, defendant was subject to both the 20-year firearm discharge enhancement and the alternate penalty provision.

Second, as to count 1, defendant was convicted of attempted murder. The jury determined that he committed the offense for the benefit of a criminal street gang and personally and intentionally discharged a firearm.[13] The court pronounced the count 1 sentence, stayed the 20-year firearm discharge enhancement under section 12022.53, subdivision (c), upon the belief that defendant did not personally fire the gun, and imposed the 10-year firearm use enhancement under section 12022.53, subdivision (b), and the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C).[14] Given

---

[13] The jury's finding of personal firearm discharge necessarily included a finding of personal firearm use. (See *People v. Dixon* (2007) 153 Cal.App.4th 985, 1001-1002 ["lesser included enhancement"].) Whereas discharge "*requires* that the weapon actually be fired" (*People v. Palacios* (2007) 41 Cal.4th 720, 725, fn. 3, italics added), use "connotes something more than a bare potential for use" (*People v. Chambers* (1972) 7 Cal.3d 666, 672), including "the threatening display of a gun" (*People v. Palacios*, *supra*, at p. 725, fn. 3), "its use as a cudgel" (*ibid.*), and "actually firing the gun" (*People v. Arzate* (2003) 114 Cal.App.4th 390, 400; see *People v. Najera* (1972) 8 Cal.3d 504, 510, fn. 5 ["[T]he word 'use' does not require an actual discharge of the weapon."]).

[14] We recognize the court previously conveyed that defendant did not personally *use* a firearm with respect to count 1, which deviated from its pronouncement imposing the firearm use enhancement. In the event of a discrepancy, the oral pronouncement prevails. (See *People v. Morelos* (2008) 168 Cal.App.4th 758, 768.)

13.

that the jury's personal firearm use finding remained intact (*ante*, fn. 13), defendant was subject to both enhancements.

## II. The abstracts of judgment must be corrected to show that the count 2 firearm discharge enhancement was 20 years and the count 3 sentence was concurrent

### a. *Background*

Two abstracts of judgment filed on January 14, 2013, specified that (1) defendant received an indeterminate sentence of 29 years to life on count 1; (2) the firearm discharge enhancement on count 2 was "20 y[ea]rs to life"; and (3) "[t]he determinate sentence on count 3 is to be served consecutive with the inde[]terminate sen[t]ences on counts 2 and 1."

### b. *Analysis*

An abstract of judgment is "a contemporaneous, statutorily sanctioned, officially prepared clerical record of the conviction and sentence." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070, italics omitted.) "Under [section 1213], 'the certified abstract of the judgment constitutes the commitment. [Citations.] It is thus the order sending the defendant to prison and "the process and authority for carrying the judgment and sentence into effect." [Citations.]' [Citation.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) However, "[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*Ibid.*; accord, *People v. Morelos*, *supra*, 168 Cal.App.4th at p. 768.) "When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [an appellate] court has the inherent power to correct such clerical error on appeal, whether on [its] own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

In this case, we find—and the Attorney General agrees—that the abstracts of judgment incorrectly provided that (1) the firearm discharge enhancement on count 2 was 20 years to life; and (2) the sentence on count 3 was consecutive. These errors must be

14.

corrected to reflect, in conformance with the trial court's oral pronouncement, that (1) the count 2 firearm enhancement was 20 years; and (2) the count 3 sentence was concurrent.

Defendant further argues that the abstracts of judgment erroneously described the count 1 sentence as "'29 years to life'" "plus 10 years plus 10 years" and should be amended to show "'an aggregate determinate term'" of "nine years plus two ten-year enhancements." We disagree. In view of the court's pronouncement of the count 1 sentence (*ante*, at p. 11) and the clerk's January 4, 2013, minutes,[15] we are convinced that the court calculated 29 years as the *minimum* term of an indeterminate sentence, in conformance with section 1170.12, subdivision (c)(2)(A)(iii),[16] not as the total length of a determinate sentence.[17]

---

[15]    The minutes detailed:

"Defendant committed to [s]tate [p]rison to serve the following term: [¶] … [¶] [Count] 1: Term of TWENTY-NINE (29) YEARS TO LIFE pursuant to [s]ection … 1170.12[, subdivision ](c)(2)(A)(iii), plus an additional term of TEN (10) YEARS pursuant to [s]ection … 12022.53[, subdivision ](b) plus an additional term of TEN (10) YEARS pursuant to [s]ection … 186.22[, subdivision ](b)(1)(C) …."

[16]    Section 1170.12, subdivision (c)(2)(A)(iii) reads, in relevant part:

"[I]n addition to any other enhancements or punishment provisions which may apply, … [¶] … [¶] … if a defendant has two or more prior serious and/or violent felony convictions … that have been pled and proved, the term for current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as … [¶] … [¶] … the term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2 …."

[17]    Moreover, contrary to defendant's insinuation, the record does not demonstrate that the court struck his prior juvenile adjudications in connection with count 1.

15.

## III. Defendant was entitled to additional presence credit

### a. *Background*

At the January 4, 2013, sentencing hearing, the public defender stated that defendant "served 6[6]6 days of actual time," but was not entitled to conduct credit because "[i]t's a three strikes case." Thereafter, the trial court awarded defendant 666 days of presentence custody credit.

### b. *Analysis*

A defendant is entitled to presentence credit against his or her term of imprisonment for "all days of custody." (§ 2900.5, subd. (a); accord, *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 (*Rajanayagam*).) "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*Rajanayagam*, *supra*, at p. 48.) A defendant is also entitled to presentence "conduct" credit "for good behavior and willingness to work during time served prior to commencement of sentence." (*People v. Thomas* (1999) 21 Cal.4th 1122, 1125; accord, § 4019.) "Notwithstanding [s]ection 4019 …, the maximum credit that may be earned …, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement" (§ 2933.1, subd. (a)) for "any person who is convicted of a felony offense listed in subdivision (c) of [s]ection 667.5" (*id.*, subd. (c)). (Accord, *People v. Aguirre* (1997) 56 Cal.App.4th 1135, 1139.) Enumerated offenses include attempted murder (§ 667.5, subd. (c)(12)), "[a]ny felony punishable by death or imprisonment in the state prison for life" (*id.*, subd. (c)(7)), and "[a]ny violation of [s]ection 12022.53" (*id.*, subd. (c)(22)).

We conclude—and the Attorney General agrees—that defendant was entitled to additional presence credit. Defendant was arrested on March 9, 2011, and sentenced on January 4, 2013, amounting to 668 days of presentence custody credit. (See *Rajanayagam*, *supra*, 211 Cal.App.4th at p. 48.) Furthermore, the public defender mistakenly declared that defendant, who had three strikes, could not be awarded

16.

presence conduct credit. Our Supreme Court held that "restrictions on the rights of Three Strike prisoners to earn term-shortening credits *do not apply to confinement in a local facility prior to sentencing.*" (*People v. Buckhalter* (2001) 26 Cal.4th 20, 32, italics added.) Instead, pursuant to section 2933.1, defendant should have been given 100 days—15 percent of the 668-day custody period—of presence conduct credit. The abstract of judgment must be corrected to reflect these properly calculated amounts. (See *People v. Buckhalter*, *supra*, at p. 30 ["'[T]he court imposing a sentence' has responsibility to calculate the exact number of days the defendant has been in custody 'prior to sentencing,' add applicable good behavior credits earned pursuant to section 4019, and reflect the total in the abstract of judgment. [Citations.]".)

## IV. The jury's on-bail finding does not need to be vacated

### a. *Background*

On February 22, 2012, the jury found that defendant had been released on bail for another offense in Case No. VCF245832 when he committed the crimes of attempted murder (count 1), shooting at an inhabited dwelling (count 2), and unlawful possession of a firearm (count 3) on March 9, 2011. On April 4, 2012, the trial court continued sentencing pending the outcome of proceedings in the earlier case. On August 9, 2012, defendant was acquitted of the offense in Case No. VCF245832. At the January 4, 2013, sentencing hearing, the court did not impose the on-bail enhancement.

### b. *Analysis*

"Any person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years, which shall be served consecutive to any other term imposed by the court." (§ 12022.1, subd. (b).) A primary offense is "a felony offense for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final …." (*Id.*,

17.

subd. (a)(1).)  A secondary offense is "a felony offense alleged to have been committed while the person is released from custody for a primary offense."  (*Id.*, subd. (a)(2).)

"Whenever there is a conviction for the secondary offense and the enhancement is proved, and the person is sentenced on the secondary offense prior to the conviction of the primary offense, the imposition of the enhancement shall be stayed pending imposition of the sentence for the primary offense.  The stay shall be lifted by the court hearing the primary offense at the time of sentencing for that offense and shall be recorded in the abstract of judgment.  If the person is acquitted of the primary offense the stay shall be permanent."  (§ 12022.1, subd. (d); see *People v. McClanahan* (1992) 3 Cal.4th 860, 869 ["[S]ection 12022.1 on-bail enhancements are not *imposed* unless the defendant is ultimately convicted of the 'primary' and 'secondary' offenses."].)

In the instant case, the court properly refrained from imposing the on-bail enhancement before and after defendant was acquitted of the primary offense.  Defendant acknowledges that the court "correctly abstained from imposing a sentence for this enhancement" and does not even dispute the veracity of the jury's on-bail finding.  Nonetheless, he asserts that this finding should be vacated.[18]  We are not compelled to do

---

[18]    Defendant cites *In re Ramey* (1999) 70 Cal.App.4th 508, which does not support his proposition and is otherwise factually inapposite.  In that case, the defendant, who was convicted of a secondary offense in California, admitted that he had been released on bail for a primary offense in Colorado.  The trial court, which initially stayed imposition of the on-bail enhancement, dissolved the stay after defendant pled guilty to an amended misdemeanor charge while on trial for the primary offense.  (*Id.* at p. 510.)  Defendant filed a petition for a writ of habeas corpus seeking review of the enhancement, which was denied.  (*Id.* at p. 511.)  On appeal, Division Six of the Second Appellate District issued a writ of habeas corpus and instructed the court to vacate its order dissolving the stay and enter a new order permanently staying the enhancement.  (*Id.* at p. 513.)  It explained:

> "[T]he pronouncement of judgment on the misdemeanor count … purged [defendant] of any accusation that he had committed a felony in Colorado.  The sole conviction suffered by [defendant] in Colorado was for a misdemeanor.  Like the Cheshire Cat, the felony count disappeared from sight, leaving nothing behind but a mischievous grin.  There being no

so in view of (1) defendant's concession that he had been released on bail for the primary offense at the time he committed the secondary offenses; and (2) the fact that leaving this true finding intact would not adversely affect his current sentence.

## V. Use of a prior, nonjury juvenile adjudication to enhance a sentence for a subsequent adult felony offense is constitutional

Finally, defendant asserts that use of his three prior juvenile adjudications as strikes was unconstitutional because he was not afforded the right to a jury trial in the juvenile proceeding. Our Supreme Court rejected this contention in *People v. Nguyen* (2009) 46 Cal.4th 1007. As defendant himself recognizes, we are bound by the doctrine of stare decisis to follow this decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## DISPOSITION

The judgment is modified as follows: (1) the count 2 firearm discharge enhancement is 20 years; (2) the count 3 sentence is concurrent to counts 1 and 2; and (3) defendant is entitled to 668 days of presentence custody credit plus 100 days of presentence conduct credit. The trial court is directed to amend the abstracts of judgment accordingly and to transmit certified copies thereof to the appropriate authorities. As so modified, the judgment is affirmed.

---

felony conviction, the stay of the enhancement should have become permanent." (*Id.* at p. 512.)

19.

 

                             _____

                                 DETJEN, J.

WE CONCUR

_____

GOMES, Acting P.J.

_____

FRANSON, J.