Filed 6/8/15  P. v. Link CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHESTER VILIODIOU LINK,<br><br>    Defendant and Appellant. | B254227<br><br>(Los Angeles County<br>Super. Ct. No. BA411809) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Jerry Smilowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Chester V. Link was charged with assault likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), attempted murder (§§ 664, 187, subd. (a)), and two of counts rape (§ 261, subd. (a)(2)).[1] Defendant pleaded not guilty to all the charges. The attempted murder charge was subsequently reduced to attempted voluntary manslaughter.

The jury found defendant guilty of the assault as charged and found true the allegation that in committing the offense, defendant inflicted great bodily injury on the victim. The jury acquitted defendant of the remaining charges, including the rape charges. Defendant was sentenced to the high term of four years for the assault and to an additional three years for the great bodily injury enhancement pursuant to section 12022.7, subdivision (a). Defendant was "given total credit for 296 days in custody," consisting of 258 days' "actual custody and 38 days good time/work time" pursuant to subdivision (c) of section 2933.1.

Defendant appealed. He makes four arguments: (1) defense counsel was ineffective in admitting in closing argument that defendant's hitting the victim, Rachel L., was excessive; (2) substantial evidence did not support the finding that defendant's use of his fists to strike Rachel L. was likely to cause great bodily injury; (3) the trial court mishandled juror misconduct; and (4) the trial court used the wrong percentage to calculate defendant's good time custody credits. None has merit, and we affirm.

## FACTUAL BACKGROUND

We summarize the trial testimony below. Rachel L. testified that she met defendant at a shelter in Santa Monica where Rachel L. was living and where defendant volunteered. They began dating toward the end of 2012. After they began dating, defendant obtained an apartment on Cloverdale where Rachel L. would visit at least once a week.

After six or seven months, defendant's attitude toward Rachel L. began to change, and he accused Rachel L. of being with someone else. Rachel L. informed defendant by

---

[1] All statutory references are to the Penal Code.

2

telephone that she had decided to break up with him. Defendant became very angry and started calling her frequently, either speaking with her or leaving messages.

Defendant wanted Rachel L. to "see him through this" and told her that he did not understand the breakup. Even though she told him that she had previously explained the reasons for the breakup to him on the telephone, he begged her to see him at his place. On May 26, 2013, Rachel L. agreed to see him in his apartment.

When she arrived at the apartment, she noticed that he was "different" and that he seemed "detached." Rachel L. was wearing a dress and carrying a purse or shoulder bag draped over her shoulder. They spoke for an hour or more about the end of their relationship. Defendant became very agitated and angry and "did not approve" of breaking up.

When Rachel L. said that she was going to leave and got up, defendant put his hand on Rachel L.'s waist, reached for the door, which he locked, and tossed Rachel L. on the couch. Rachel L. is 4 feet 11 inches and weighed about 110 pounds. She was lying on her side and before she could sit up, he sat down on her and started beating her with his fist. The blows landed on her face, ears, neck, and shoulders. Rachel L. was screaming for help and begged him to stop. He was cursing her and calling her a "'bitch.'"

Rachel L. further testified that when defendant got up, he told her to get off the couch, but she fell to the floor. He pulled her up and told her to go to the bathroom. In the bathroom, he told her that because plan A did not work, he would go to plan B because she did not want to get back with him. Plan B was to drown her in the bathtub; the bathtub was already filled with water. He told her to get into the tub facedown and he would sit on her head until she died.

At some point in the bathroom, defendant told Rachel L. that he was going to "fuck" her first. Her face was covered with blood. He left the bathroom to take off his pants. He returned with a kitchen towel, told her not to get blood on him, and put the towel on her face. He pushed her head into the bathroom sink and, with her back to him, had intercourse with her for a minute or so. Rachel L. felt her head to be "just a mush"

3

and her ears were buzzing. He told her, "'Look into that bathtub. That's where you can end up.'"

Defendant then left the bathroom and Rachel L. locked the bathroom door from the inside. Her purse was still on her and she took out her phone. She turned the location service back on and called 911. She told the 911 operator that she had been assaulted and stated that she did not know the address, but it was on Cloverdale.

Rachel L. then unlocked the bathroom door because she did not want defendant to get even angrier; she thought he could kick the door in. Defendant came back into the bathroom and raped her again. The intercourse did not last long and defendant left the bathroom. Rachel L. walked out into the apartment and was met at the front door by Officer Sean Anthony (Anthony) and his partner.

Anthony testified that defendant answered their knock on the front door. Anthony noticed a red stain on defendant's shirt and he asked defendant to step outside. Defendant said that there was no emergency; the neighbors were only complaining about loud music. Anthony then noticed Rachel L. approaching, her face covered with blood. Anthony immediately handcuffed defendant. Anthony described Rachel L. "like some kind of traumatic situation that happened to her. She was very short of breath. She was very faint in her answers. And she kept saying that it hurt to talk." Anthony saw a large laceration on her forehead that kept bleeding and other wounds across her face and head. She identified defendant as the person who had hit her. She was then transported to the hospital by ambulance.

Rachel L. testified that she remained in the hospital for five days. She had difficulty talking, her nose was broken in two places, and her eyebrow and eye socket were fractured. Her mouth was cut up inside and swollen. She received stitches on her forehead and her eyebrow. She was put on a morphine drip.

Rachel L. also testified that she did not know why she did not tell the officers she had been raped; she attributed her failure to do so to her injuries and that she "was left so afraid and [she] just didn't even think about it." After she came out of the sedation, she

4

told a program manager from the shelter, Leslie Abraham (Abraham), about the rape when Abraham visited her in the hospital.

Abraham confirmed in her own testimony that Rachel L. had informed her about the rape while Rachel L. was in the hospital. Abraham also described Rachel L.'s appearance during Abraham's visit in the hospital: "It was hard because her face was so badly beaten and bruised. She said she was in a lot of pain, but wanted me to know . . . because she felt comfortable telling me that he had raped her. And then proceeded to tell me that he had wanted to kill her, and that he was going to do that after he beat her. And that there was Plan A and Plan B."

Defendant testified as well. He admitted that Rachel L. came to see him on May 26, 2013, at his Cloverdale apartment. He stated that at that time his shower did not work and that he had a girlfriend. He also said that only 20 to 30 minutes had elapsed from when she arrived at his apartment and the police arrived. Initially, they argued about an incident that had happened a few days earlier. She then got up, retrieved a half-frozen liter-sized water bottle and started hitting him on the back of his head with it. He claimed that she left a bump on his head, but he never told the police about the bump "at the scene."

He further testified that he then fell to the floor when his shoulder popped out and that when he got up, she tried to kick him. He said that he tackled her toward the couch. They were then wrestling. He admitted hitting her "one time between the eyes as she hit me. She began to bleed. I swung again, missing everything." He was crying, then fell to the floor again, at which point she walked toward the rest room and stayed there for about three to four minutes. He went into the rest room, gave her a towel, and went outside to get help. Five minutes later, the police arrived, who told him to "shut up" and put him in a police car. He denied raping Rachel L. and said that he had not had sex with her since April. He disclaimed knowing anything about water in the bathtub.

On cross-examination, he said he was hurt but not angry when Rachel L. arrived at the Cloverdale apartment. He disclaimed uttering any expletives or that Rachel L. had

broken up with him. Standing 5 feet 9 inches and weighing about 220 pounds, he admitted being bigger than Rachel L.

Anthony testified on rebuttal that defendant never complained about shoulder pain while he was being handcuffed or being placed in the police car.

Several photographs were admitted into evidence, including photographs of the living room and bathroom in the Cloverdale apartment, a bloody cushion, a bloody towel, bruises on Rachel L.'s face, which she testified were the product of defendant's beating, and defendant in a T-shirt and boxer underpants. The jury was also shown photographs of Rachel L. taken a day after she was brought to the hospital; the jury heard a CD of Rachel L.'s conversation with the 911 operator as well.

## DISCUSSION

**Defense counsel was not ineffective in conceding that defendant struck the victim with excessive force**

Defendant contends that defense counsel was ineffective because he conceded that defendant hit Rachel L. with excessive force, thereby compromising defendant's only defense, which was that Rachel L. was the aggressor and that he had hit her only once in self-defense. Defendant further argues that "Counsel's concession cannot be construed as a plausible tactical move." To the contrary, the record reveals that defense counsel's concession was tactical, and turned out to be good strategy.

A claim that defense counsel was ineffective requires a showing that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561 (*Jones*).) To succeed on a claim of ineffective assistance, the defendant must also overcome presumptions that counsel was effective, and that the challenged action or inaction might be considered sound trial strategy. (*Ibid.*) Counsel is given broad discretion in the area of tactics and strategy, but the exercise of that discretion must be founded upon reasonable investigation and preparation, and be evaluated in light of the facts and options reasonably apparent to counsel at the time of trial. (*Id.* at pp. 561, 564–565.)

6

In order to prevail on a claim of ineffective assistance of counsel on appeal, "'"the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission."'" (*People v. Majors* (1998) 18 Cal.4th 385, 403.) "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) Nonetheless, "'"deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions."' [Citations.] 'Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance.'" (*Jones*, 13 Cal.4th at pp. 561–562.)

Defendant was facing rape charges. The photographs of Rachel L.'s face, and Anthony's and Abraham's testimony about Rachel L.'s appearance after her encounter with defendant, were entirely inconsistent with defendant's assertion that he had hit her only once in self-defense. He had a two-to-one advantage over her in weight and was almost a foot taller than she. Defense counsel could have rationally concluded that defendant's assertions that she was the aggressor, wielding a mere half-frozen water bottle, and that he had to inflict the latter injuries on her in self-defense were not plausible. Worse yet, defendant's testimony minimizing the assault or his blows could have garnered the jury's distrust when it was considering the more serious rape charges.[2] In short, defense counsel could have made the tactical choice to admit elements of the

---

[2] As defense counsel argued: "There is the swelling of the lips. Could it happen another time? Maybe Mr. Link only remembers the first punch. Maybe he threw more than one. Likely, he did. But that doesn't mean he is lying about everything. There was a lot of passion here."

less serious count[3] in order to give defendant the best chance of acquittal on the rape charges. Defense counsel's strategy was on the mark, as it turned out.

**Substantial evidence supported the jury's finding of great bodily injury**

Defendant argues that insufficient evidence supported the jury's finding of great bodily injury because other than their difference in size, there was no indication that defendant's "hits were likely to cause great bodily injury"; a "flurry of blows may or may not cause great bodily injury . . . ."

"It is settled that the offense of assault with force likely to produce great bodily injury . . . may be perpetrated by means of the hands alone." (*People v. Tallman* (1945) 27 Cal.2d 209, 212.) Indeed, the jury was so instructed, and defendant does not claim instructional error. The jury was also instructed that "great bodily injury" "means a significant or substantial physical injury. Minor, trivial or moderate injuries do not constitute great bodily injury." Again, defendant does not contend that this instruction was erroneous.

In determining whether sufficient evidence supported a verdict, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.) We do not reweigh evidence and we resolve all conflicts and take all inferences in favor of the judgment.

There was ample evidence to support the jury's finding that defendant's multiple blows were delivered with force sufficient to produce great bodily injury. Defendant's blows broke Rachel L.'s nose in two places and fractured her eyebrow and eye socket; Rachel L. had difficulty talking. She was in the hospital for five days and required morphine to alleviate her pain. This description of her injuries was uncontested at trial. Defendant's argument to the contrary is unconvincing.

---

[3] Assault is punishable by two, three, or four years (§ 245, subd. (a)(4)); rape is punishable by three, six, or eight years (§ 264, subd. (a)).

8

**The trial court's refusal to make further inquiry into potential juror misconduct was not an abuse of discretion**

Defense counsel reported that during a recess in the trial, he saw a juror, later identified as Juror No. 6, and "perhaps" another female juror talking with Anthony near the elevator. He called Anthony "over" and reminded him that the females were jurors. Anthony said that he did not know that they were jurors, and defense counsel told him to "stick around." Defense counsel reported to the trial court that Anthony had told him that Juror No. 6 had discussed "something about his job, working at Wilshire, and that she had a son or some family member that was either related to that station or wanted to work at that station."

The trial court then questioned Anthony outside the presence of the jury. Anthony stated that the juror had told him that her son had a school project at the Wilshire station and that the juror asked if he "knew someone" with whom Anthony was unfamiliar. She also talked about her son and "asking how he can keep—stay out of trouble, and that's it." Anthony reiterated that he did not know that the female was a juror and that she was not wearing a juror badge.

The trial court then questioned Juror No. 6. She confirmed that she and Anthony had spoken about her son and whether Anthony knew "a person that work [*sic*] there and that was it." When questioned by the court, she confirmed that there was nothing about her contact with Anthony that would cause her "to be anything other than fair and impartial in this case."

The court then asked the juror to step outside and asked counsel for "any comment." Defense counsel informed the court that "there is one other potential witness outside the door." Defense counsel did not identify that witness. The court responded that it did not "find any reason to conduct a further inquiry" and that any further investigation was "solely [his] discretion." He cited legal authority in support of his obligation to conduct a reasonable investigation, and noted that "further hearing is required only if I possess information, which, if proven true, would constitute good cause to doubt a juror's ability to perform her duties and would justify the juror's removal."

9

The court ruled that it had conducted what it found was a sufficient investigation and did not feel it needed "to inquire further."

Defense counsel then made an oral motion for a mistrial; defense counsel stated that his client did not join in that motion. When asked on what the motion was based, defense counsel responded, "The record before the court." The court found that "the presumption of prejudice for juror misconduct has been dissipated and there is no prejudice." The court also found that the contact between the juror and Anthony was "de minimus." Defendant contends that the court abused its discretion in failing to call the unidentified witness and that the defense's mistrial motion should have been granted.

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. . . . [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343.)

We conclude that the trial court did not abuse its discretion in handling the contact between Juror No. 6 and Anthony. The court inquired into the nature of the contact, which the court expressly found was inadvertent and did not involve matter at issue in the case. The court also made a finding that the contact was "de minimis." The court inquired whether Juror No. 6 could still be fair and impartial in light of the contact, and was satisfied that she could be. Defense counsel never identified the other witness at trial, nor does defendant here. Defendant just speculates that "if this person [were] a juror," defense counsel would not have been able to interview the witness.

We find no abuse of discretion in the trial court's refusal to conduct a further hearing based on such speculation. A fortiori, the trial court did not err in refusing to grant a mistrial based on the same arguments. (*People v. Cowan* (2010) 50 Cal.4th 401, 505–508 [finding no prejudicial error in trial court's failure to make further inquiry in a death penalty case when juror was seen sitting next to defendant's family members and

10

potentially conversing with them where, among other reasons, there was no indication that juror heard anything to do with the trial].)

**The trial court did not err in limiting defendant's custody credit to 38 days**

The trial court awarded defendant 38 days of "good time/work time" custody credit, or 15 percent of defendant's 258 actual days in custody pursuant to section 2933.1, subdivision (c),[4] instead of the more favorable rate in section 4019, subdivision (f),[5] which defendant argues should have been applied to defendant's good time custody credits.

Defendant does not dispute that he was convicted of a felony to which section 2933.1 applies.[6] He acknowledges that the Fifth and First Appellate Districts in *People v. Aguirre* (1997) 56 Cal.App.4th 1135, 1140–1141, and *People v. Palacios* (1997) 56 Cal.App.4th 252, 258, respectively, have rejected his argument that the 15 percent limitation in section 2933.1, subdivision (c) does not apply to good time custody credits. "Subdivision (c) applies by its terms to 'any person specified in subdivision (a),' that is, a person 'convicted of a felony offense listed in Section 667.5.' Such a person may accrue no more than 15 percent of section 2933 prison worktime credit (§ 2933.1, subd. (a)), and also may not be awarded section 4019 presentence good time/worktime credits in excess

---

[4] "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." (§ 2933.1, subd. (c).)

[5] "It is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody." (§ 4019, subd. (f).)

[6] Section 2933.1, subdivision (a) states that the 15 percent limitation applies to felonies listed in section 667.5, subdivision (c), which includes "[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice . . . ." (§ 667.5, subd. (c)(8).)

of 15 percent of his actual period of confinement (§ 2933.1, subd. (c)).” (*People v. Palacios*, at p. 258.)

Defendant  merely asserts that the reasoning in those cases “is faulty.”  We do not agree and conclude that the trial court’s award of 38 days of “good time/work time” custody credits was not erroneous.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                                                BENDIX, J.*

We concur:


    CHANEY, Acting P. J.


    JOHNSON, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.